**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------X

PLUMBERS, PIPEFITTERS & MES LOCAL   :
UNION NO. 392 PENSION FUND, On      :
Behalf Of Itself And All Others     :
Similarly Situated,                 :
                                    :
                  Plaintiff,        :
                                    :
                                    :      No. 11 Civ. 5097 (JFK)
     -against-                      :
                                    :      **OPINION & ORDER**
FAIRFAX FINANCIAL HOLDINGS LIMITED, :
ODYSSEY RE HOLDINGS CORP, V. PREM    :
WATSA, TREVOR J. AMBRIDGE, GREG      :
TAYLOR, M. JANE WILLIAMSON,          :
ROBERT HARTOG, ANTHONY F.            :
GRIFFITHS, BRADLEY P. MARTIN,        :
BRANDON SWEITZER, and                :
PRICEWATERHOUSE COOPERS,LLP,         :
CHARTERED ACCOUNTANTS,               :
TORONTO ONTARIO, CANADA,             :
                                    :
                  Defendants.       :

----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Aug. 13, 2012

APPEARANCES

FOR PLAINTIFF PLUMBERS, PIPEFITTERS & MES LOCAL UNION 392
PENSION FUND
Geoffrey C. Jarvis
Grant & Eisenhofer P.A.

Paul Scarlato
Angelina Nguyen
Labaton Sucharow LLP

Mario Alba, Jr.
Robbins Geller Rudman & Dowd LLP

FOR DEFENDANT FAIRFAX FINANCIAL HOLDINGS, et al.
Brian H. Polovoy
Shearman & Sterling LLP

FOR DEFENDANT PRICEWATERHOUSE COOPERS
Christopher Davies
Scott Litvinoff
WilmerHale

**JOHN F. KEENAN, United States District Judge:**

Currently before the Court is a motion to dismiss in this proposed securities class action.  In an Opinion and Order dated October 12, 2011, the Court granted Plaintiff Plumbers, Pipefitters & MES Local Union 392's ("Plaintiff") unopposed motion to be appointed lead plaintiff and approved its selection of co-lead counsel.

Defendants Fairfax Financial Holdings Limited ("Fairfax"), Pricewaterhouse Coopers LLP, Toronto, Canada ("PwC"), V. Prem Watsa ("Watsa"), Trevor J. Ambridge ("Ambridge"), Greg Taylor ("Taylor"), M. Jane Williamson, Robert Hartog, Anthony F. Griffiths, Bradley P. Martin, and Brandon Sweitzer (collectively, "Defendants") have moved to dismiss.  For the following reasons, Defendants' motion is granted.

### I. Background

The following facts are taken from the Complaint, unless otherwise noted.  This proposed class action is brought on behalf of all purchasers of securities issued by Fairfax from May 21, 2003 to March 22, 2006 (the "class period").  Plaintiff asserts that Fairfax, several of its directors and officers, and PwC violated Sections 11 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

Fairfax is a financial services holding company headquartered in Toronto, Canada. Through its subsidiaries, Defendant Fairfax is engaged in property and casualty insurance and reinsurance, investment management, and insurance claims management. Defendant PwC is a limited liability partnership organized under the laws of the Province of Ontario, Canada. PwC was Fairfax's independent auditor during the putative Class period.

Plaintiff's pension fund is a collectively bargained multi-employer plan established and maintained by Local 392. Roughly 3,100 union members participate in the pension fund, which has approximately $211 million in total assets. During the class period, the pension fund purchased some 2,300 shares of Fairfax subordinate voting shares on the New York Stock Exchange.

Plaintiff's Complaint, which spans more than 200 pages and is 517 paragraphs long, alleges that Fairfax intentionally failed to properly account for "finite reinsurance" contracts, lacked internal controls, and fraudulently boosted its financials during the class period. Because PwC was Fairfax's auditor during the relevant period, Plaintiff alleges that PwC was complicit in the fraud.

According to Plaintiff, Fairfax suffered from a lack of liquidity, which caused the company's management to seek ways to create the appearance of adequate reserves, including raising

3

capital in the United States securities market.  However,
Fairfax did not have the amount of money in reserves required by
law before an insurance company can pay dividends to its
shareholders.  Plaintiff alleges that Fairfax entered into
several reinsurance contracts with a number of different
entities to hide business losses. The Complaint alleges that the
Company accounted for these contracts as though they covered a
portion of risk that in effect was not transferred.  Plaintiff
alleges that if the reinsurance contracts had been properly
accounted for, Fairfax's liquidity crisis would have been
exposed.  Further, Plaintiff alleges that the Company overstated
the strength of its internal controls, and used offshore
entities to conceal losses.  Plaintiff contends that these
actions and corresponding representations formed part of a
fraudulent scheme to inflate the stock price.  The Complaint
alleges that disclosures, in the form of press releases issued
by Fairfax, a conference call with investors, and news articles,
beginning in June of 2005, caused the Company's stock to
decline.

In support of these allegations, Plaintiff relies on the
following:

1) Governmental Investigations of Fairfax.  Plaintiff
states that in November 2004, state and federal officials began
an investigation into the use of "finite reinsurance" contracts

4

by major insurers and reinsurers.  The SEC targeted many companies, including Fairfax and its subsidiaries, issuing subpoenas for records of Fairfax's reinsurance contracts and for Fairfax's CEO, Defendant Watsa.

As the SEC investigation continued, Fairfax issued press releases to notify its investors of the circumstances surrounding the investigation, ultimately issuing five press releases that are at issue in this case.  In a press release issued March 22, 2006, Fairfax announced that the company's auditor, PwC, had also been subpoenaed.  In each press release, Fairfax emphatically denied wrongdoing.  Additionally, several news outlets, including the Wall Street Journal, wrote about the SEC and Department of Justice's industry-wide inquiry into the accounting of finite reinsurance contracts.

The SEC concluded its investigation of Fairfax with a "no action" letter issued on June 25, 2009.

Fairfax's common stock, which ranged from $154.86 to $187.20 during the class period, declined with news of the SEC investigation and financial restatements.  Fairfax's share price dropped $19.17 per share on the day the Wall Street Journal reported the SEC's probe into Fairfax.  Following the March 22, 2006 press release, the stock "suffered its biggest single day decline in approximately 3 years, falling from $130.90 to $113.93 per share." (Pl. Br. at 13).

2) Financial Restatements issued by Fairfax.  Plaintiff alleges that the fact that Fairfax issued two financial restatements demonstrates fraud.  One restatement was issued on February 8, 2006.  In a February 10, 2006 conference call, Watsa told investors that the February 8 restatement was issued after the discovery of an accounting error for a finite reinsurance contract at a Fairfax subsidiary, OdysseyRe.  Following this announcement, from February 8, 2006 through February 20, 2006, Fairfax's stock price declined from $150.45 per share to $147.00 per share.

Next, in July 2006, Fairfax announced that it would have to restate its financials going back to 2001, as a result of the Company's cancellation of a finite reinsurance contract. Plaintiff claims that the restatement, which was released in November 2006, demonstrates that Fairfax artificially inflated shareholder equity by 15% per year from 2001 to 2006.

3) Fairfax's "Deceptive" Accounting Practices.  Plaintiff alleges that during the class period, Fairfax issued materially false and misleading statements regarding its business practices and financial results.  With respect to the finite reinsurance contracts, Plaintiff alleges that Fairfax inflated the value of its assets and concealed its lack of liquidity by "fraudulently accounting for reinsurance contracts which were, in essence, loans."

6

Plaintiff also alleges additional deceptive acts by Fairfax and its subsidiaries, including:  using privately held foreign assets domiciled in jurisdictions with lax oversight to permit the Company to manipulate its investment income; failing to properly account for losses in companies that should have been consolidated with Fairfax; and improperly accounting for intercompany transactions.  Fairfax's subsidiaries and individual directors are also implicated in the complaint for, inter alia, improperly "funneling money to cash-strapped subsidiaries" and knowing of or recklessly disregarding Fairfax's fraud.

4) PwC's Audit Opinions.  Plaintiff alleges that PwC rendered materially inaccurate audit opinions with respect to Fairfax's consolidated financial statements for 2002, 2003, and 2004.  (PwC did not audit the financial statements for OdysseyRe.)  Plaintiff alleges that PwC falsely stated: (i) that its audits for the Class Period conformed to Canadian Generally Accepted Auditing Standards, and (ii) that PwC ignored "red flags" that would have alerted the reasonable auditor that Fairfax's financial statements violated U.S. Generally Accepted Accounting Principles ("GAAP").

## II.  Discussion

### A. Statute of Repose

While the parties do not dispute that this proposed class action lies outside the statute of repose,[1] Plaintiff asserts that the limitations period should be tolled from April 11, 2006, when another putative lead plaintiff filed substantially the same Complaint.  The 2006 Complaint was ultimately dismissed for lack of subject matter jurisdiction. See Parks v. Fairfax Fin. Holding Ltd., et al., No. 06 Civ. 2820, 2010 WL 1372537 (S.D.N.Y. Mar. 29, 2010).  To advance this argument, Plaintiff cites  the tolling doctrine set forth by the Supreme Court in American Pipe & Construction Co. v. Utah, 414 U.S. 538, 553 (1974).

The doctrine known as "American Pipe tolling" has been used to permit a plaintiff to file an action even after the statute of limitations has run, if the plaintiff had relied on a putative class action that was timely filed but ultimately dismissed.  If American Pipe tolling were applied here, Plaintiff's claim would be timely since a putative class action

---

[1] Plaintiff's Section 11 claims are subject to a three-year statute of limitations from the date of the registration statement, so Plaintiff was required to file this action by January 15, 2008.  Plaintiff's Section 10(b) claims are subject to a five-year statute of repose from the date of the misrepresentation, so Plaintiff was required to file this action by March 16, 2011, five years after the last alleged misstatement.  Plaintiff filed its Complaint on July 25, 2011.

was filed within the statutory period and dismissed, at which point this Plaintiff sought to intervene.  However, the American Pipe opinion addresses statutes of limitations, not statutes of repose, which are at issue in this litigation.  The Second Circuit has noted that statutes of repose are fundamentally different from statutes of limitations:

> [S]tatutes of limitations bear on the availability of remedies and, as such, are subject to equitable defenses . . . , the various forms of tolling, and the potential application of the discovery rule. In contrast, statutes of repose affect the availability of the underlying right: That right is no longer available on the expiration of the specified period of time. In theory, at least, the legislative bar to subsequent action is absolute, subject to legislatively created exceptions.

P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 102 (2d Cir. 2004).

There is no consensus among courts on whether to toll statutes of repose, and the Second Circuit has not ruled on the applicability of American Pipe to statutes of repose.  In the absence of direct guidance, this Court considers the statute's plain language and legislative intent behind statutes of repose as well as Supreme Court and Second Circuit precedent in finding that statutes of repose are not subject to equitable tolling.

First, while the Supreme Court has not considered this issue, there is precedent indicating that statutes of repose should not be subsumed under American Pipe.  In Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991).

9

the Supreme Court indicated a strong preference against tolling statutes of repose.  In so holding, the Court noted that the "period of repose [is] inconsistent with tolling." 501 U.S. 350 at 363.  Plaintiff would have this Court find that Lampf applies only to equitable tolling, and that American Pipe tolling is a form of legal tolling.

Even if the Court were to accept that Lampf applies only to the equitable tolling of statutes of repose, the Court is unable to find any indication that American Pipe tolling is legal, rather than equitable, tolling.  Conversely, there is sufficient evidence in dicta from the Supreme Court and the Second Circuit that American Pipe tolling is a form of equitable tolling.  In fact, the Supreme Court has twice referred to American Pipe tolling as equitable in nature. See Young v. United States, 535 U.S. 43, 49 (2002) (citing American Pipe in support of the proposition that "[i]t is hornbook law that limitations periods are customarily subject to equitable tolling . . . unless tolling would be inconsistent with the text of the relevant statute") (quotation omitted); Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 n. 3 (1990) (citing American Pipe for the proposition that "[w]e have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period").  The Second Circuit has also cited American Pipe as an

10

example of equitable tolling. <u>Veltri v. Building Service 32B-J</u>
<u>Pension Fund</u>, 393 F.3d 318, 322-23 (2d Cir. 2004).

Second, simply because the same policy considerations that
underpinned the <u>American Pipe</u> decision are present here does not
require that statutes of repose be treated in the same manner as
statutes of limitations.  Rather, the two statutes should be
treated as distinct, as each achieves a different purpose.
Indeed, the Second Circuit has recognized the inherent
difference between statutes of repose and statutes of
limitations:  statutes of repose have to do with whether the
"right to sue is [still] available," whereas statutes of
limitations bear on the "availability of remedies." <u>P. Stolz</u>
<u>Family P'ship</u>, 355 F.3d at 102.  When the right to sue has been
extinguished, no judicially-created remedy can resuscitate it.

In addition, the absolute language of the statute of repose
plainly precludes judicial circumvention of the repose period,
even in class action suits.  The statute of repose for Section
11 claims, set forth in the Securities Exchange Act, states that
"[i]n no event" shall [Section 11] claims be asserted "more than
three years after" the pertinent offerings. 15 U.S.C. § 77m.
The statute of repose for Section 10 provides that "may be
brought no later than . . . five years after [the alleged]
violation." 28 U.S.C. § 1658.  "If Congress had intended that
the . . . statute of repose [to] apply differently to securities

11

class actions — which are not uncommon occurrences — it certainly could have provided so. It still may. In the absence of further legislation, this Court must apply the statute as written." In re Lehman Bros. Secs. and Erisa Litig., 800 F. Supp. 2d 477, 483 (S.D.N.Y. 2011) (adding that "[w]hen it comes to statutes of repose, however, the relevant policies are those of Congress rather than any that courts might think preferable.").

Moreover, the legislative history suggests that Congress intended statutes of repose to impose an absolute limitation on litigation. Norris v. Wirtz, 818 F.2d 1329, 1332 (7th Cir.), cert. denied, 484 U.S. 943 (1987) ("The legislative history in 1934 makes it pellucid that Congress included statutes of repose because of fear that lingering liabilities would disrupt normal business and facilitate false claims. It was understood that the three-year rule was to be absolute."); Ceres Partners v. GEL Assocs., 918 F.2d 349, 363 (2d Cir. 1990) ("We see no basis for concluding that a one-year/three-year period with regard to claims under §§ 10(b) and 14 and Rule 10b-5 is not what Congress would have chosen.").

### B. Section 10 Claims

Even if the statute of repose did not bar Plaintiff's action, the Plaintiff's Section 10 claims would still be dismissed for failure to state a claim. As explained below,

12

Plaintiff fails to plead materiality with respect to the restatements and fails to plead loss causation with respect to its more general allegations of Fairfax's allegedly fraudulent accounting practices.

### i. Materiality

### a. Arguments

Fairfax asserts that the misstatements it made as to the accounting for two finite reinsurance contracts were not material because the restatement of one of those reinsurance contracts had no impact on Fairfax's financial statements during the Class Period and the restatement of the second contract had the effect of increasing Fairfax's net earnings and decreasing a net loss during the Class Period.  Therefore, Fairfax argues, "the grand scheme plaintiff has concocted regarding finite reinsurance actually resulted in Fairfax underreporting its net earnings during the Class Period." (Fairfax Br. at 20).

Plaintiff, however, relies on the fact that the restatement impacted shareholder equity in 2002 and 2003 to demonstrate materiality.  Plaintiff asserts that although net earnings were not negatively impacted by the restatement, shareholder equity was diminished because the "fraudulent reinsurance transactions" improperly boosted assets.  According to Plaintiff, because the reinsurance contracts caused an increase in assets, the

misstatements gave shareholders a false impression of how much the company was worth in 2002 and 2003.

Moreover, Plaintiff asserts, the material misstatements were not limited to the reinsurance contracts. According to Plaintiff, Fairfax deceived investors regarding the value of its assets through misleading statements regarding: (1) the adequacy of internal controls, (2) valuations of privately held investments in foreign jurisdictions, (3) accounting for its investments in Zenith, (4) accounting for investments in fixed income securities, (5) accounting for various intercompany transactions, and (6) accounting for income taxes.

### b. Law & Application

In order to determine whether a misleading statement is material, courts must engage in a fact-specific inquiry. Basic Inc. v. Levinson, 485 U.S. 224, 240 (1988). The materiality of a misstatement depends on whether "'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" Id. at 231–32. Accordingly, in order for the misstatement to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. The determination of whether an alleged misrepresentation is material necessarily depends on

14

all relevant circumstances. Ganino v. Citizens Utils. Co., 228
F.3d 154, 162 (2d Cir. 2000).  Because materiality is a mixed
question of law and fact, in the context of a motion to dismiss,
"'a complaint may not properly be dismissed . . . on the ground
that the alleged misstatements or omissions are not material
unless they are so obviously unimportant to a reasonable
investor that reasonable minds could not differ on the question
of their importance.'" Id. (quoting Goldman v. Belden, 754 F.2d
1059, 1067 (2d Cir. 1985)) (alteration in original).

     The fact that shareholder equity was impacted in 2002 and
2003 as a result of improperly accounted finite reinsurance
contracts does not demonstrate materiality.  By Plaintiff's own
admission, the alleged misstatements only affected shareholder
equity, not profits or losses, and only then between 2002 and
2003 – just seven months into the nearly three-year class
period.  Changes in shareholder equity, however, are mostly
simple accounting changes.  Such changes affect the amount of
the company's worth that is attributed to the shareholders, but
it does not necessarily impact the ultimate value of the
company.  Indeed, one could construct a scenario where, as here,
shareholder equity is negatively affected by a misstatement but
profits are unchanged (or even positively affected) by the same
misstatement.  To allow Plaintiff to argue that a correction
that increases profits actually harms shareholders would be to

15

force companies into virtual strict liability for any misstatement.  Essentially, Plaintiff is trying to establish a scenario where companies are liable for any accounting misstatement even if shareholders got a bargain for a stock that was ultimately <u>more</u> valuable than they initially thought.

The Court is mindful that the issue of materiality should not be resolved on a 12(b)(6) motion unless the statements at issue are "obviously unimportant" to a reasonable investor. <u>In re Kidder Peabody Secs. Litig.</u>, 10 F. Supp. 2d 398, 409 (S.D.N.Y. 1998).  However, the fact that materiality is a "mixed question of law and fact," <u>id.</u>, does not render it immune from analysis at the motion to dismiss stage.  Where Plaintiff's allegations do not, as a matter of law, establish materiality, dismissal is appropriate. <u>ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 197 (2d Cir. 2009) (granting dismissal because the alleged misstatement was immaterial as a matter of law).  The restatements here cannot form the basis for materiality as a matter of law because a reasonable investor would not be influenced by these restatements, which did not negatively impact Fairfax.

### ii.  Loss Causation

As materiality has not been established with respect to Fairfax's misaccounting for finite reinsurance contracts, the

Court's analysis of loss causation will include only Plaintiff's allegations of Fairfax's alleged improper accounting practices.

### a. Arguments

Plaintiff argues that the five press releases issued about the SEC investigation demonstrate corrective disclosures with respect to Fairfax's "epidemic" of manipulations and improper accounting schemes.  Plaintiff states that "a series of disclosures, relating primarily to the SEC and DOJ investigations of Fairfax, revealed that Fairfax was not the successful entity portrayed; rather, the market learned the Company had concealed massive financial irregularities."

Plaintiff contends that because Fairfax's share price declined significantly "on expanding revelations of governmental investigation," the disclosures must have been corrective.  To buttress this argument, Plaintiff notes that the stock decreased after each announcement: (1) down 1.6% after the June 24, 2005 press release on the initial SEC subpoena; (2) down 4% in the days following the September 7, 2005 press release detailing another SEC subpoena; (3) down 1.4% the day after the October 10, 2005 press release announcing that the DOJ had joined the SEC investigation; (4) down 4.8%  over the several days following the press release announcing that the U.S. Attorney in the Southern District of New York would review information; (5)

17

down 4.5% in the days following the OdysseyRe restatement; and
(6) down 13% in the day following the announcement of new SEC
subpoenas.

### b. Law & Application

"Loss causation is the causal link between the alleged
misconduct and the economic harm ultimately suffered by the
plaintiff." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172
(2d Cir. 2005).  Loss causation is related to the tort law
concept of proximate cause: it "is intended 'to fix a legal
limit on a person's responsibility even for wrongful acts,'" and
it requires that the plaintiff's loss be foreseeable. Id. at 174
(quoting Castellano v. Young & Rubicam, 257 F.3d 171, 186 (2d
Cir. 2001)); see also First Nationwide Bank v. Gelt Funding
Corp., 27 F.3d 763, 769-70 (2d Cir. 1994).  A misstatement "is
the 'proximate cause' of an investment loss if the risk that
caused the loss was within the zone of risk concealed by the
misrepresentations . . . alleged by a disappointed investor."
Lentell, 396 F.3d at 173.

To form an adequate basis for loss causation, a given
disclosure need not emanate from a particular source, "take a
particular form[,] or be of a particular quality." In re Winstar
Commc'ns, 01 Cv. 3014, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27,
2006).  Thus, loss causation may be grounded in disclosures
couched as opinions, or in other statements that are not

18

"verifiably truthful" at the time they are made. Id.
Furthermore, loss causation may be premised on partial
revelations that do not uncover the complete extent of the
falsity of specific prior statements. See In re Motorola Sec.
Litig., 505 F. Supp. 2d 501, 533 (N.D. Ill. 2007).
Nevertheless, a particular disclosure constitutes a sufficient
foundation for loss causation allegations only if it possesses a
sufficient nexus to a prior misstatement such that it reveals at
least part of the falsity of that misstatement. See, e.g., In re
AOL Time Warner, 503 F.Supp.2d 666, 679 (S.D.N.Y. 2007).

Here, there is no logical connection between the press
releases and Plaintiff's vague allegations of manipulations and
improper accounting.  The press releases do not provide any
indication of mismanagement other than potential issues related
to finite reinsurance contracts.

Plaintiff is essentially arguing that the press releases
made shareholders aware of the issues surrounding Fairfax's
finite reinsurance contracts, which, by some unexplained
connection, also disclosed to shareholders that Fairfax was an
irresponsible company.  While loss causation certainly need not
be demonstrated explicitly, Plaintiff's purported relationship
between the press releases and Fairfax's improper accounting
mechanisms is far too tenuous to support a claim.  See Payne v.
DeLuca, 433 F. Supp. 2d 547, 609 (W.D. Pa. 2006) (holding that

plaintiffs inadequately pleaded loss causation because "the content of the press release would not [have] alerted investors that the Company had been perpetrating a fraudulent scheme"). Plaintiff has not demonstrated a "sufficient nexus' between Fairfax's "irresponsibility" and the press releases.

Plaintiff relies heavily on a recent Southern District case, In re Take Two Interactive Securities Litigation, 551 F. Supp. 2d 247 (S.D.N.Y. 2008), in which the court found that a press release announcing that the SEC had commenced an investigation into certain stock options grants, coupled with a 7.5% stock price drop the next day, created a sufficient causal connection to plead loss causation. Id. at 286-57. However, the Take Two Court also held that a press release from a different date could not form the basis for loss causation because it was "insufficiently linked" to the company's alleged misrepresentations. Id. at 283. Thus, Take Two is distinguishable from the case at bar, rendering Plaintiff's reliance on its holding inapposite.

Plaintiff's allegations of loss causation relating to Fairfax's accounting practices do not satisfy the pleading requirements under Dura and its progeny. While the press releases directly address the investigations into the finite reinsurance contracts, they do not mention any investigation into Fairfax's general accounting policies and practices. Thus,

an investor would not be put on notice that Fairfax was engaging in the type of fraudulent accounting practices that Plaintiff alleges. See Dura, 544 U.S. at 347 (a complaint must provide "some indication of the loss and the causal connection that the plaintiff has in mind"), In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d at 679 ("Without providing a nexus between the alleged fraud and their losses, either by demonstrating the materialization of a concealed risk or the existence of a corrective disclosure, the plaintiffs fail to plead loss causation.").

Plaintiff has not established materiality with respect to the restatements related to the finite reinsurance contracts; nor has it demonstrated loss causation with respect to Fairfax's allegedly improper accounting practices. Therefore, Plaintiff's claims under Section 10 are dismissed in their entirety and the Court need not explore the Complaint's allegations as to scienter, or the other issues specific to OdysseyRe and Pricewaterhouse Coopers.

### C. Section 11 Claims

Defendants have moved to dismiss Plaintiff's Section 11 claims for lack of standing. Plaintiff purchased shares of Fairfax's common stock on July 2, 2004 and September 9, 2004, but stock was not sold pursuant to the challenged offerings, until October 28, 2004 and September 28, 2005. Therefore,

Defendants contend that Plaintiff does not have standing because it cannot possibly have purchased Fairfax's stock pursuant to or "traceable to" the Offerings.

Plaintiff responds that because it has standing to bring some claims, it should be permitted to assert claims on behalf of future class members. Moreover, Plaintiff states that class certification is "logically antecedent" to Article III standing and that this Court should defer challenges to standing until class certification, citing Blessing v. Sirius XM Radio, Inc, 756 F. Supp. 2d 445, 452 (S.D.N.Y. 2010) ("while there is no question that plaintiffs in a proposed class action must have standing to sue the defendant on 'at least some claims,' whether they may bring each claim asserted on behalf of the proposed class is properly determined after class certification is decided.").

Section 11 provides a cause of action to "any person acquiring [a] security" pursuant to a "registration statement" if "any part of the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k.  The Second Circuit permits a suit under Section 11 by any plaintiffs who can "trace" their shares to the allegedly defective registration statement. See DeMaria v. Andersen, 318 F.3d 170, 176 (2d Cir.

2003), <u>Barnes v. Osofsky</u>, 373 F.2d 269, 271 (2d Cir. 1967)
(assuming that an action under Section 11 may be maintained by
"those who purchase securities that are the direct subject of
the prospectus and registration statement"). Here, because
Plaintiff purchased shares <u>before</u> the challenged offerings, it
cannot possibly "trace" its stock purchases to an offering or
registration statement.

Plaintiff seeks to obviate its standing dilemma by
purporting to assert claims on behalf of an entire class, some
of whom presumably purchased shares of Fairfax stock after the
challenged offering. However, the Second Circuit has admonished

> "That district courts should be mindful that named
> plaintiffs in a class action must allege and show that they
> personally have been injured, not that injury has been
> suffered by other, unidentified members of the class to
> which they belong and which they purport to represent.
> Unless [they] can thus demonstrate the requisite case or
> controversy between themselves personally and [defendants],
> 'none may seek relief on behalf of himself or any other
> member of the class.'"

<u>W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP</u>, 549 F.3d
100, 106 (2d Cir. 2008) (citing <u>Warth v. Seldin</u>, 422 U.S. 490,
502 (1975). Because Plaintiff does not have a cognizable claim
under Section 11 and Second Circuit precedent prevents it from
asserting the claim on behalf of unnamed parties, the Section 11
claims should be dismissed.

Plaintiff cites <u>Blessing</u> to suggest that class
certification is "logically antecedent" to standing issues. (Pl.

Br. at 61).  These cases, however, are inapposite, as they address situations where class certification would have been "dispositive" and therefore logically preceded any other Article III issues.  Here, class certification is not a dispositive issue, and thus, evaluation of Plaintiff's Section 11 claims is warranted at this stage.

### III. Conclusion

For the reasons stated above, the Defendants' motion to dismiss is granted.  Because the statute of repose has run, the Court declines to grant leave to replead.  The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated:   New York, New York
         August 13, 2012

John F. Keenan
United States District Judge