C7GAPLUAps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

PLUMBERS, PIPEFITTERS & MES LOCAL
UNION NO. 392 PENSION FUND, on
Behalf of Itself and All Others
Similarly Situated,

                    Plaintiff,

          v.                              11 CV 5097 (JFK)

FAIRFAX FINANCIAL HOLDINGS LIMITED,
ODYSSEY RE HOLDINGS CORP,
V. PREM WATSA, TREVOR J. AMBRIDGE,
GREG TAYLOR, M. JANE WILLIAMSON,
ROBERT HARTOG, ANTHONY F. GRIFFITHS,
BRADLEY P. MARTIN, BRANDON SWEITZER,
and PRICEWATERHOUSECOOPERS, LLP,
CHARTERED ACCOUNTANTS, TORONTO,
ONTARIO, CANADA,

                    Defendants.

------------------------------------x

                                          New York, N.Y.
                                          July 16, 2012
                                          10:55 a.m.

Before:

                    HON. JOHN F. KEENAN

                                          District Judge

C7GAPLUAps

1                              APPEARANCES

2  GRANT & EISENHOFER, P.A.
        Attorneys for Plaintiffs
3  BY:  GEOFFREY C. JARVIS, ESQ.

4  LABATON SUCHAROW LLP
        Attorneys for Plaintiffs
5  BY:  ANGELINA NGUYEN, ESQ.
        PAUL J. SCARLATO, ESQ., of Counsel
6
   ROBBINS GELLER RUDMAN & DOWD LLP
7       Attorneys for Plaintiffs
   BY:  MARIO ALBA, JR., ESQ.
8
   SHEARMAN & STERLING LLP
9       Attorneys for all Defendants
        other than PricewaterhouseCoopers
10 BY:  BRIAN H. POLOVOY, ESQ.

11 WILMER CUTLER PICKERING HALE and DORR LLP
        Attorneys for Defendant PricewaterhouseCoopers,
12      LLP, Canada
   BY:  CHRISTOPHER DAVIES, ESQ.
13      SCOTT M. LITVINOFF, ESQ.

14

15         (In open court)

16         THE COURT:  This is in the matter of Plumbers

17 Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax

18 Financial Holdings Limited, et al.  And first starting with, as

19 I understand it, for all the defendants other than

20 PricewaterhouseCoopers, is going to be Mr. Polovoy.  Correct?

21         MR. POLOVOY:  Yes, sir.

22         THE COURT:  How do you do.

23         MR. POLOVOY:  Good morning.

24         May it please the Court, Brian Polovoy with Shearman &

25 Sterling.  As your Honor noted, I represent all the defendants

C7GAPLUAps

1    in this case, except for PricewaterhouseCoopers.

2              Your Honor, this is a securities action, and there are

3    numerous grounds on which to dismiss this action.  Many of them

4    existed when the plaintiff first filed this lawsuit over six

5    years ago on behalf of another plaintiff.

6              THE COURT:  I think that was a case before Judge

7    Daniels?

8              MR. POLOVOY:  Excuse me?

9              THE COURT:  That was the case before Judge Daniels?

10             MR. POLOVOY:  Correct.  And certain additional grounds

11   exist by virtue of the passage of six years since that time,

12   and additional grounds based on the nature of this plaintiff

13   itself.

14             Your Honor, there was no fraud here.  The allegation

15   is that this is an accounting fraud.  The allegation is that

16   the defendant company, a Canadian financial company that owns

17   insurance companies, fraudulently accounted for its cost of

18   finite risk reinsurance.  The plaintiff's complaint, for all

19   its length, essentially boils down to that alleged accounting

20   fraud.  When one looks at it, for all its length, there are two

21   points.  There was an SEC investigation of Fairfax Financial,

22   which is correct, and that the company many months later had an

23   accounting restatement, which is also correct.  When we cut to

24   the nub of it, your Honor, as to the SEC investigation, there

25   was an industry-wide investigation into dozens of insurance

C7GAPLUAps

1    companies as to how they accounted for finite risk reinsurance,

2    and critically, the SEC, as to Fairfax, closed the

3    investigation without taking any action.

4          As to the restatement that plaintiff makes so much

5    about, only two of 200 finite risk reinsurance contracts were

6    restated.  And the restatement -- and this might make this a

7    rare securities fraud action -- the restatement ended up

8    increasing the net earnings of the company during the

9    restatement period and had no effect on shareholders' equity.

10   So it's difficult to see how a buyer of Fairfax stock could

11   argue that they were defrauded, when the alleged fraudulent

12   accounting, a mistake that was restated, ended up increasing

13   the net earnings during that period.

14         And during this entire time, your Honor, during this

15   entire time, the three individuals that plaintiff's counsel

16   accuses of fraud were buying millions of dollars of their

17   company's stock during the entire class period.  There is case

18   after case where scienter is found because the officer

19   defendants were selling the stock when allegedly artificially

20   inflating the stock.  This is a case where the plaintiffs were

21   buying.  And in one case, one of the officers, the CEO, bought

22   over $6 million worth of stock during the class period.

23         Let me begin, then, your Honor, with the ground that

24   did not exist when plaintiff's counsel first filed the lawsuit

25   over six years ago, which is the statute of repose.  There is

C7GAPLUAps

1    no dispute that the statute of repose, both the '33 Act and the

2    '34 Act claims, had run by its terms.

3              THE COURT:  Colleagues of mine in this district have

4    gone each way, right?

5              MR. POLOVOY:  That is correct, Judge.

6              THE COURT:  Judge Stein ruled against your position,

7    as I understand it.

8              MR. POLOVOY:  Judge Stein has ruled in our favor.

9              THE COURT:  Castel and Kaplan have ruled in favor of

10   your position.

11             MR. POLOVOY:  And the issue is before the Second

12   Circuit.  And the briefs --

13             THE COURT:  All four cases?

14             MR. POLOVOY:  Two of the cases.  They've been

15   consolidated.  One of them went one way.  The other I believe

16   went the other way.  There is an interlocutory appeal.

17             Our point here, your Honor, unless your Honor would

18   like to go through each of those cases, we believe it is clear

19   when you look at the analysis that unlike *American Pipe*, when

20   one has a bifurcated statute, the statute of limitations, two

21   years, statute of repose, five years, that the five years can't

22   be tolled.  And the briefs in those cases of all of your

23   colleagues discuss whether or not that later period could ever

24   be accurately tolled.  And obviously, if the Second Circuit

25   rules in our favor on that, that would be dispositive of our

C7GAPLUAps

1     case.  Our point here, your Honor --

2             THE COURT:  You don't want me to wait for that, do

3     you?

4             MR. POLOVOY:  The oral arguments have not been set.  I

5     would leave that to you.  But that would be dispositive.

6             Our point here is that even if the Court says that

7     equitable tolling is in some circumstances allowed, just

8     because equitable tolling is allowed in some circumstances

9     doesn't mean that this Court should invoke equity for this

10    plaintiff.  And this is a case where this plaintiff sat on the

11    sidelines for years, was told that it should sue, it should

12    file its own lawsuit, and it chose not to.  And there is

13    nothing alleged in the plaintiffs' opposition brief that

14    suggests that equity is warranted here.

15            THE COURT:  And *American Pipe* dealt with the statute

16    of limitations, not with statutes of repose?

17            MR. POLOVOY:  That's correct, your Honor.

18            THE COURT:  Let me ask you this.  In reading all this

19    and thinking about it, is it really fair to the plaintiff not

20    to toll the statutes of repose?  The plaintiffs, they didn't

21    waste any time filing after the motion to intervene was denied,

22    did they?

23            MR. POLOVOY:  A year and a half.

24            THE COURT:  Was it?

25            MR. POLOVOY:  Over a year.  When the motion to

C7GAPLUAps

intervene was denied, which was in 2010, I believe, July of

2010 if I'm not mistaken, the CI Funds, who was the plaintiff

in that case, did not appeal.  No appeal was taken of the

decision by Judge Daniels, except the Plumbers Fund, which is

their new plaintiff now, that plaintiff, as a non-party, filed

a notice of appeal from the decision dismissing the CI Funds

case.  So what they're essentially saying is -- it's

unprecedented -- is that when they, as a non-party, appealed

from the dismissal of a different party's lawsuit, that they

were in essence tolling the time within which they themselves

should bring an action.  And we said all along that that

doesn't work, that they should file another lawsuit.  And the

Second Circuit made very clear, it said, you should have filed

your own lawsuit, and its exact words were counsel's failure or

refusal to file its own lawsuit to the extent that that failure

has any effect on the statute of limitations defense -- that

counsel, plaintiff's counsel here, that their failure or

refusal to file a lawsuit didn't give them standing there.  And

whether that has any effect on the statute of limitations

obviously would be for your Honor to decide.

         But to be clear, CI Funds, over a year went by between

when CI Funds decided not to appeal dismissal by Judge Daniels

and July of 2011, when this plaintiff filed its own lawsuit.

         Your Honor, the main issue -- I don't want to argue

over -- those are not technicalities, because the statute of

C7GAPLUAps

1   repose is one intended to give defendants true repose as

2   opposed to a statute of limitations, which is simply intended

3   to put them on notice.  This is a case that my client has been

4   accused of fraud now for over six years.

5        Let's look at what the actual fraud allegations are.

6   These are the grounds that are listed in the motion to dismiss

7   that I filed back in 2006, and still exist today.

8        The first is the alleged misstatement.  And the

9   misstatement here, again, we say there is no actionable

10  misstatement.  The case is about finite risk reinsurance, and

11  in order to be accurate there was a restatement, which means

12  there was an acknowledgment that the accounting had to be

13  restated.  The accounting that was restated ended up with the

14  finite risk transaction's increasing net earnings and having no

15  effect on shareholder equity.  We're at a loss to understand

16  how a buyer of Fairfax stock during the class period could

17  argue that an accounting error that showed that the net

18  earnings, when it was buying the stock, were understated is

19  somehow an actionable misstatement.  And I searched in the

20  opposition brief and I do not see any response to that.  And

21  absent an actual misstatement, there's no securities fraud

22  case.

23       But then we get to whether or not there was a

24  misstatement, whether that is fraud, they have alleged fraud

25  and obviously they have a high burden of alleging facts,

C7GAPLUAps

proving facts that give rise to a strong inference that my

clients acted with an intent to defraud.

THE COURT:  It is saying it was reckless.  They're not

saying it was intentional, are they?

MR. POLOVOY:  Well, if they're not -- they'll tell you

what they say.  They certainly are not alleging motive and

opportunity, so they do have to then have the corresponding

higher burden of conscious disregard or recklessness.

But with motive and opportunity, it's not enough to

just say I'm going to have to prove that I'm going to focus on

conscious disregard, because when your Honor gets to the

balance test, it's one thing to say we have no motive; it's a

different thing when the facts suggest the complete opposite.

And there is case after case in this district and elsewhere

that says when officer defendants are purchasing stock of their

company during the class period, that that entirely vitiates

any argument that there was a fraud.  Why would the CEO of this

company purchase over $6 million of stock in this company if he

was running a supposed huge fraud to artificially inflate the

stock?  And the other two individual defendants similarly were

buying the stock during this class period.

So you're right that there's no motive argument, but

we suggest that simply ignoring our motive argument is

something that they can't do.  The case law supports that as

well.

C7GAPLUAps

1          THE COURT:  You pointed out that the bottom line was

2     benefited, that there were profits.  But wasn't there a

3     negative impact, as the plaintiffs argue, on shareholder

4     equity?  Isn't that sufficient for materiality?

5          MR. POLOVOY:  There was none.  And they do argue that

6     in their opposition brief.  And our reply brief actually cites,

7     if you look at the restatement itself, because the numbers are

8     what they are and your Honor is obviously permitted to look at

9     that, it is in the complaint, and they are telling you what the

10    restatement was, when one looks to the actual restatement, and

11    this is in our reply brief, at Exhibit P to my affidavit, at

12    page 13 if I'm not mistaken, it says there was no impact on

13    shareholder equity.  The restatement of these two finite risk

14    reinsurance contracts had no impact on shareholder equity.  It

15    increases.  The net earnings during the period of the

16    restatement increase.

17         Let me be a little more precise.  One of the two

18    contracts that was misstated had no effect.  The other one

19    ended up being an increase in equity.  You're correct, your

20    Honor, that they are in conscious disregard.  They had the

21    existence of the restatement itself, which we all know is not

22    enough.  That shows there was a mistake, not that there was

23    scienter.

24         And then we have this host of confidential witnesses.

25    And I will not, in the time we have this morning, go through

C7GAPLUAps

what each and every one of them said.  The briefs, I believe,

show in some detail why those do not give rise to an inference

of scienter, much less a very strong inference of scienter.

What I will note is, only one of those confidential witnesses

even mentions finite risk reinsurance.  That one didn't even

work for Fairfax.  And for the other confidential witness --

THE COURT:  Number 9?

MR. POLOVOY:  Number 9, correct.  The other eight,

they talk about various and sundry issues.  They used the usual

hyperbole that you see in these types of complaints.  And they

talk about issues -- there were other issues in that

restatement that had nothing to do with finite risk

reinsurance, and therefore aren't at issue in the case, because

there was never any disclosure of them that caused the loss.

Keep in mind when this restatement came up, the share prices of

their equity went up.  So they don't get loss causation by

arguing something that is discussed in that restatement.

But, again, when you look to the balancing, you have

on the one hand a restatement, and I have to deal with that,

and that means there were mistakes in those financial

statements, and that is not scienter.  On the other hand, when

you balance it, your Honor, you have the absence of motive, the

absence of motive to defraud and the existence of a credible

motive not to defraud.  You have the fact that this alleged

accounting fraud is only two of 200 of the contracts.  If

C7GAPLUAps

1    you're going to use the wrong accounting method, reinsurance

2    accounting versus deposit accounting, as part of the fraud, you

3    don't do it for just 200.

4            And they also have -- and the complaint says this

5    itself -- this is a very sophisticated and difficult issue of

6    accounting, whether to use reinsurance accounting or deposit

7    accounting.  Shouldn't be surprised that there was a mistake on

8    certain of those contracts.  Not something they're proud of,

9    but that certainly is not an indication of fraud.

10           And you have the fact that this restatement, at the

11   end of the day, the reason why we know it was not fraud is that

12   it increased the net earnings of the company and had no effect

13   on shareholder equity.  And during this whole time, you have

14   these folks buying stock and the SEC closes its investigation.

15           Your Honor, with respect to loss causation -- again

16   I'll just touch on that because I go through it in some length

17   in the briefs -- they argue that we mischaracterize what their

18   loss causation arguments are.  Nine paragraphs of the

19   complaint, they quite clearly only relate to finite risk

20   reinsurance, but instead of getting into a war of words as to

21   how we characterize the complaint, the Court can actually look

22   at the disclosure itself.  All the disclosures which are

23   referenced in the complaint are attached to my declaration.

24   They only apparently talk about this finite risk reinsurance.

25   This other hodgepodge of alleged wrongdoing, what have you, are

C7GAPLUAps

1    never mentioned in any of the disclosures that are the ones

2    that this plaintiff, like the plaintiff six years ago, alleged

3    caused his loss.  It's over a few months' disclosures of

4    receiving subpoenas from the SEC.  And that is what is alleged.

5    That is what they alleged caused their loss, that is what they

6    allege now caused their loss, and we are at one that the

7    disclosure of the existence of the SEC subpoena is not loss

8    causation.  And all of these other allegations of wrongdoing

9    have nothing to do with risk reinsurance.

10           Your Honor, if I might briefly touch on the second.

11   And this is one of their examples where this plaintiff, the

12   Plumbers Fund, has a problem that perhaps the original

13   plaintiff on whose behalf they filed doesn't have, which is

14   that this plaintiff bought all of his shares before the two

15   offerings that he alleges violated Section 11 of the '33 Act,

16   and it is very clear that one could not have purchased pursuant

17   to an offering when one purchased all of its shares prior to

18   that offering.  Their only response is that your Honor should

19   wait until class certification because that's the right time to

20   deal with this.  And as we cite at length in our brief, every

21   single case in this district addressed that issue, and they

22   make the exact same argument in numerous cases.  They have said

23   that you have to address standing on a motion to dismiss.  And

24   if they don't have standing here, which they do not, those

25   claims should be dismissed.

C7GAPLUAps

1            That Section 11 claim is also another independent

2    ground to dismiss.  It is barred by the statute of limitations.

3    Put aside the fight, which, as your Honor noted, in this

4    courthouse there are many different views as to whether the

5    statute of repose controls.  The statute of limitations

6    itself -- put aside the repose period -- the limitations itself

7    was running for at least 15 months after the first case was

8    dismissed.

9            THE COURT:  I think I have your points.  You're a

10   little over your time.  Thank you.

11           MR. POLOVOY:  Thank you, your Honor.

12           THE COURT:  All right.  And it is going to be

13   Mr. Litvinoff or Mr. Davies?

14           MR. DAVIES:  Chris Davies, sir.

15           Chris Davies, your Honor, on behalf of PwC Canada.

16           Your Honor, I'm going to try to limit my points here

17   to three areas.  I believe the rest of them are addressed in

18   the briefs.  Of course I'd be happy to answer any of your

19   questions.  The first of those is with respect to loss

20   causation.  Plaintiffs here contend that the truth of the

21   alleged fraud was revealed over a period between June 2005 and

22   March 2006 in a series of court disclosures.  Those

23   disclosures, however, as they acknowledge in our opposition,

24   never actually address Fairfax's financial statements.  Rather,

25   as they characterize it in their opposition, they refer to

C7GAPLUAps

1    serial disclosure investigations.  And their contention in

2    their opposition is that a serial disclosure investigation

3    itself can amount to disclosure of financial impropriety or

4    fraud.  We don't believe that's true, your Honor.  We believe

5    that, instead, those disclosures between June 2005 and March

6    2006 concern the development of ongoing investigations by

7    various U.S. government agencies.

8         The fact that those investigations were occurring and

9    indeed the intensity of those investigations does not go to

10   whether the financial statements were accurate or inaccurate.

11   Mr. Polovoy discussed, of course, there was ultimately an error

12   identified with respect to finite reinsurance.  However, the

13   disclosures concerning that error occurred in July and November

14   of 2006, after the close of this class period.

15        Moreover, as we address in both our original brief and

16   our reply, the disclosure of that error ultimately led to a

17   substantial increase in the stock price, not a decrease.  The

18   plaintiffs here don't -- yes, your Honor.

19        THE COURT:  Wasn't the correct disclosure based upon a

20   misaccounting of figures that were audited by Price-

21   waterhouseCoopers?

22        MR. DAVIES:  I'm sorry, your Honor.  I missed the

23   question.

24        THE COURT:  Wasn't the corrective disclosure based

25   upon a misaccounting of figures that were audited by Price

C7GAPLUAps

1   WaterhouseCoopers?  Isn't that enough for loss causation?

2               MR. DAVIES:  But in this instance, your Honor, the

3   only disclosures that pertain to misaccounting are from July of

4   2006 and November 2006, months after the class period ended.

5   As a consequence, there can be no loss causation associated

6   with them for the period of class.  The only disclosures here,

7   your Honor, have to do with investigations.  And the topic

8   associated with OdysseyRe has nothing to do with Fairfax's

9   financial statements, which, PwC didn't audit these financial

10  statements.

11              So, your Honor, they acknowledge, I believe at page 58

12  of the opposition, their argument here, their loss causation

13  argument, is premised on this serial disclosure of the

14  investigations, rather than of errors.  And they cite two

15  cases, your Honor.  They cite one case, *Winstar*, that concerns

16  an actual disclosure of financial statement errors.  They say

17  the second case, whose name is now eluding me, that actually

18  refers to three things; it refers to SEC investigations, it

19  refers to an internal investigation, and it refers to the fact

20  that the company is going to suspend the release of its

21  upcoming financial statements.  Those cases are entirely

22  inapposite in this instance where the disclosures pertain

23  solely to the existence and developments in the government

24  investigations pertaining to finite reinsurance.

25              Then as to scienter, your Honor, here, though there

C7GAPLUAps

 1    are a fair number of pages that get into scienter, the PwC

 2    Canada scienter in plaintiff's papers, there is very little of

 3    substance.  Our papers cover this, I think, in some depth.

 4              THE COURT:  The confidential witnesses don't say

 5    anything about you, do they?

 6              MR. DAVIES:  That's right.  The confidential witnesses

 7    say nothing.  Nor are they able to point to anything that any

 8    of our people, or PwC Canada itself, in fact knew.  Rather,

 9    they rely largely on these red flags.  I'll refer to only one

10    of them, the one that concerns the known history of securities

11    law violations.  Presumably that would require both a history

12    and a violation.  Plaintiffs refer us to two supposed facts.

13    One is a 2004 letter that was copied to a PwC partner, Kevin

14    Dancey.  That letter supposedly identified an inability to

15    reconcile between securities held at Fairfax subsidiaries and

16    Fairfax's own books.  The company, even according to the

17    complaint, responded to that letter.  So far as the plaintiffs

18    here allege, there is in fact no error that we know of in the

19    company's response to the letter on which Mr. Dancey was

20    copied, so it's unclear how that had anything to do with either

21    a history or a violation.

22              The second thing to which they cite is the June 2005

23    SEC subpoena itself, which, again, given the time period

24    covered by this claim, doesn't reveal a history of securities

25    law violations.

C7GAPLUAps

1          So as to scienter, your Honor, we believe that the

2     absence of any confidential witness testimony and the absence

3     of any actual fact alleged with respect to PwC's own knowledge

4     and a failure to cite any meaningful red flags means there is

5     no scienter with respect to PwC Canada.

6          The last topic I wanted to address, just to follow-up

7     on the discussion you had with Mr. Polovoy on the statute of

8     repose, I would point out only that the three cases that favor

9     our side in this discussion, the ones cited by Judges Kaplan

10    and Castel, addresses the Rules Enabling Act.  The two cases

11    that go in the other direction do not.  Nor are we aware of any

12    case cited that refers to cites and addresses the Rules

13    Enabling Act in connection with *American Pipe*'s applicability

14    to a statute of repose that favors the plaintiff's side.  We

15    therefore believe there's a strong statutory argument, separate

16    and apart from the policy arguments that you discussed with

17    Mr. Polovoy, favoring defendant's position on the statute of

18    repose.

19          Unless you have any other questions, your Honor, that

20    was all I had at this time.

21          THE COURT:  Thank you very much.  And arguing for the

22    plaintiff, I take it is going to be Mr. Jarvis?  Is that right?

23          MR. JARVIS:  I'm going to take the merits argument.

24    Ms. Nguyen is going to take the statutes argument.  She'll take

25    about five minutes and I'll take about 15.

C7GAPLUAps

1           THE COURT:  OK.  And you are Mr. Jarvis?

2           MR. JARVIS:  I am Jeff Jarvis, your Honor.

3           THE COURT:  And you are Ms. Nguyen.

4           MS. NGUYEN:  Yes, your Honor.

5           THE COURT:  OK.  Fine.

6           MS. NGUYEN:  Good morning, your Honor.  Angelina

7    Nguyen.  I'll briefly address the statute of repose issue.  The

8    Tenth Circuit in *Joseph v. Wiles* and a majority of district

9    courts nationwide have held that the three statutes of repose

10   applicable here under the Securities Act and the Exchange Act

11   are actually satisfied by all unnamed class members if a named

12   plaintiff files such claims within --

13          THE COURT:  And what's the name of that case?

14          MS. NGUYEN:  The Tenth Circuit case is *Joseph v.*

15   *Wiles*.

16          THE COURT:  And what about the other case in the Tenth

17   Circuit, *Anixter v. Home Stake Production*?

18          MS. NGUYEN:  *Joseph v. Wiles* actually discusses that

19   case, your Honor.

20          THE COURT:  All right.  Go ahead.

21          MS. NGUYEN:  We submit that those courts are correct,

22   your Honor, and this court should follow their approach,

23   because a class action serves claims on behalf of unclaimed

24   class members who should be treated as though they have been

25   named plaintiffs during the pendency of the class action or

C7GAPLUAps

1    until class certification is denied.  That's what the Supreme

2    Court said in *Chardon v. Fumero Soto*.  Therefore, the unnamed

3    class members are deemed to satisfy the statute of repose,

4    based upon the filing by a named plaintiff within the

5    three-year period, even if that named plaintiff is subsequently

6    found deficient or class certification is denied.  The Supreme

7    Court applied this analysis in the *American Pipe* and in *Crown*

8    *Cork*, and held that the limitations period was satisfied for

9    absent class members by a named plaintiff filing the action

10   within the limitations period.  The Supreme Court recognized

11   that unless the statute of limitation was tolled by the filing

12   of the class action, class members would be unable to rely on

13   the existence of the suit to protect their rights.  Only by

14   intervening or taking other action prior to the running of the

15   statute would they be able to ensure their rights were not

16   lost.

17          In the absence of tolling, a putative class member who

18   fears that class certification would have every incentive to

19   file a separate action prior to the expiration of its own

20   period.  The result would be a needless multiplicity of

21   actions -- precisely the situation that Fed.R.Civ.P. 23 and

22   *American Pipe* were designed to avoid.

23          This rationale applies equally to the statute of

24   repose.  Even though the doctrine under *American Pipe* has come

25   to be known as *American Pipe* tolling, as numerous courts have

C7GAPLUAps

1   explained, including *Joseph v. Wiles* in the Tenth Circuit and

2   as Judge Stein set forth in his opinion in *Citigroup*, it is not

3   really a matter of tolling, but, rather, of tolling that the

4   timing requirements for filing the suit were satisfied by the

5   unnamed class members.  Accordingly, distinctions of *American*

6   *Pipe* as involving a statute of limitations to which equitable

7   tolling can apply rather than a statute of repose to which it

8   cannot are inapposite and frankly irrelevant.

9          For the same reason, the line of cases, including

10  Judge Kaplan's and Castel's opinions, that rely on *Allen v.*

11  *Gilbertson*, which held that the statute of repose cannot be

12  equitably tolled, that case, your Honor, *Lamp*, did not involve

13  a class action, and therefore did not consider the same policy

14  reasons and rationale behind *American Pipe* and the so-called

15  tolling that *American Pipe* applied in order to preserve the

16  class action rights, your Honor.

17         THE COURT:  Didn't Judge Kaplan find that the language

18  of the statute of repose was absolute, and didn't he write in

19  his opinion -- how do you get around what he said, "If Congress

20  had intended the statute of repose to apply differently to

21  securities class actions, which are not uncommon occurrences,

22  it certainly could have provided so.  It still may.  In the

23  absence of further legislation, the court must apply the

24  statute as written"?  And isn't the statute as written that

25  there's nothing after five years?

C7GAPLUAps

1          MS. NGUYEN:  Yes, your Honor, but the same argument

2     was made in *American Pipe*.

3          THE COURT:  That was a statute of limitations, not a

4     statute of repose.

5          MS. NGUYEN:  The absolute bar language was the same in

6     the statute of limitations, your Honor.  It was emphatically

7     absolute, providing that any action to enforce any cause of

8     action under the antitrust laws in that case shall be forever

9     barred unless commenced.  That was in effect the statute of

10    repose, your Honor.  And the Supreme Court in that case held

11    that the policy considerations behind Rule 23 did take that,

12    absent class members satisfying -- it's not a matter of

13    tolling, your Honor, but that the absent class members satisfy

14    the time period.

15         If your Honor has no more questions for me, I will

16    hand it over to Mr. Jarvis.

17         THE COURT:  All right.  Thank you.

18         Mr. Jarvis.

19         MR. JARVIS:  Good morning, your Honor.

20         THE COURT:  Good morning.

21         MR. JARVIS:  I'm here to address the merits arguments,

22    and as you might gather, I'm going to probably disagree quite a

23    bit with some of the things that Mr. Polovoy stated to the

24    Court regarding what this case is about and what in fact the

25    statements that have been made by defendants are.

C7GAPLUAps

1          THE COURT:  If you agreed we wouldn't be here.

2          MR. JARVIS:  Excuse me, your Honor?

3          THE COURT:  If you didn't disagree we wouldn't be

4     here.

5          MR. JARVIS:  That's pretty much always the case.

6     Mr. Polovoy and I have done this dance before, so we have our

7     lines down pat by now.

8          Mr. Polovoy talks and defendants do in their papers

9     that this is a scheme dealing solely with finite reinsurance

10    and they say it's just disclosures of investigations and no

11    actual changes with anything to do with finite insurance and

12    ultimate restatement.  And I would take major issue with both

13    of those statements.  The case simply is not only about finite

14    reinsurance and whether it was properly accounted for.  As your

15    Honor will gather from reading the papers and probably has, it

16    is the plaintiffs' view that this case is about a company,

17    Fairfax, that was in severe distress, from a reserve point of

18    view.  It didn't have enough money to reserve for the insurance

19    that an insurance company had to reserve for its claim.  It

20    simply didn't have enough money.  The company itself was

21    threatened.  So what did they do?  They took a number of steps

22    in fact to shore up the balance sheet.  They sold some more

23    equity.  They sold pieces of certain businesses they owned.

24    And certainly no one could argue that those are appropriate

25    ways to increase your balance sheet.  But they also did a whole

C7GAPLUAps

1     bunch of other things that weren't, because they couldn't close

2     the gap by selling and that sort of thing.  And what do we

3     argue they did?  We argue that they in fact misclassified

4     finite reinsurance on $665 million worth of policies.  A lot of

5     money.  We claim that they improperly accounted for offshore

6     investments.  They very conveniently lost money.  They have one

7     year, for example, 2005, where they had a $500 million claim

8     related to Katrina.  They lost $15 million on their U.S.

9     investment.  Very conveniently, they gained $400 million on an

10    offshore investment where the only criterion for price, for

11    valuing the investment, is the whim of the board of directors

12    of the entity involved.  They essentially needed 400.  Our

13    argument is, they made it up.

14          We have other asserted buyer issues related to Xenith

15    and to accounting for fixed income investment.

16          But the goal here is, all of the things -- and it's

17    not -- you know, the defendants want to focus on how much their

18    net income increased or decreased over the net loss, how much

19    was their net income increased or their net loss decreased.

20    That is not what this law is about.  We're not suggesting that

21    they sought to inflate their financials with respect to the

22    cash flow or earnings any particular year.  The goal is that

23    they were willing to sacrifice earnings in order to increase

24    shareholder equity.

25          THE COURT:  But if Fairfax's bottom line was improved,

C7GAPLUAps

```
1    even if it was by the misstatements, how does your claim go
2    forward?
3              MR. JARVIS:  But that's my next point.  Let's just
4    look at the finite reinsurance Mr. Polovoy went through, and in
5    particular let's look at page 13 of the restatement, which is
6    Exhibit 40 to Mr. Polovoy's declaration, Exhibit 4.  I have a
7    copy.  I believe it's Exhibit 4 to Mr. Polovoy's.  Maybe it's
8    P.  I'm I little confused.  But at page 13 of the September
9    2006 restatement.  And what it says in a footnote is, we know a
10   couple, that we know comparing these stated amounts of
11   shareholder equity and assets to the previous filed financial
12   statements, we know that shareholder equity in 2003 was
13   increased by $491 million, had to be restated down, in 2004
14   $465 million, in 2005 $426 million.  Those are not
15   insubstantial numbers.  What Mr. Polovoy refers to is page 13,
16   at the bottom of the page, where they specifically say what
17   portion of shareholder equity was related to the reinsurance
18   contracts as restated.  And what they say is, there was no
19   impact on shareholder equity in 2004 and 2005.  I could just
20   bring up the page, your Honor, if you like.  They don't say,
21   for example, what happened in 2002 and 2003.  Just because they
22   don't provide the information doesn't mean it didn't happen.
23   They specifically said, no impact in '04-'05, that there had
24   been no impact in '02, '03.  And the annual report for '02 is
25   the first day of the class period.  Then they could have said
```

C7GAPLUAps

1   so.  They didn't.  I think the supposition is there was an

2   impact in '02, '03.  And we know that overall, shareholder

3   equity in '03 was increased by $491 million as a result of

4   their manipulations.

5          We also know that in 2002, their assets were increased

6   by $353 million.  And it is our view, because these two

7   reinsurance contracts that were restated actually were rolled

8   up in '04, that the impact of those was in '02 and '03, not in

9   '04, which is why they could say in '04 and there was no

10  impact, because those contracts were rolled up.

11         So we argue they actually got quite an enormous

12  bottom-line benefit as a result of the -- in the area where

13  they needed it.  It was not in profit and loss but in assets

14  available to support the reserves that they needed to have.

15         I will briefly touch on the restatement.

16         And I think that is really the key to this whole

17  thing.  Your Honor understands the fraud, and I'm sure your

18  Honor does, that we've alleged, and understands that the

19  impact -- that they can't say -- and Mr. Polovoy has said this

20  a bunch of times -- there was no impact on shareholder equity

21  during the class period.  Well, the class period starts for the

22  annual report for '02 and runs into '03, and there's absolutely

23  nothing that says what those impacts were.  They could have

24  said none.  They didn't, we presume because there were massive

25  shareholder equity impacts.  And I think we're entitled to that

C7GAPLUAps

1    presumption, that in fact it was due, at least in part, to

2    those reinsurance contracts.

3           So there is in fact a material misstatement.  And

4    we've got to keep in mind that in fact there was a restatement

5    that was made to this material.  They indicate in the

6    restatement of '06, they said they were all material; all these

7    changes are material to the bottom line.

8           And the important piece that I don't want to forget,

9    it all comes down to the point that, why do they do this?

10   Because they had terrible, terrible internal control.  There

11   are tallies all over the place.  But what do they say in the

12   restatement?  They have, "As of December 31, 2005, the

13   following material weaknesses have been identified, including

14   in management's assessment:  The company did not maintain an

15   appropriate accounting and financial reporting organizational

16   structure."  And he said "deficient complement of accounting

17   personnel to support the activities of the company."  "This

18   control deficiency" -- I'm skipping stuff here.  "This control

19   deficiency appeared for each of the material witnesses

20   described below."

21          Point 2.  "The company did not maintain effective

22   controls of completeness and accuracy of period-end financial

23   reporting and period-end closing processes."  "This control" --

24   skipping some stuff, "This control deficiency resulted in

25   restatement of the company's consolidated financial statements

C7GAPLUAps

for the years ended December 31, 2001 through 2005," Four
years or five years of financial statements.

         Paragraph 3, "The company did not maintain effective
control in the accounting for certain derivative instruments."
It of course was FAS 133. Again they say that resulted in a
restatement. "The company did not maintain effective control
over the completeness and accuracy of the calculation of the
income taxes," and certain other things. Again, it resulted in
a restatement. It says, "Each of the controlled deficiencies
described in 1 to 4 above could result in the misstatements of
any of the company's financial statement accounts and
disclosures that would result in a material misstatement to the
annual or interim consolidated financial."

         So this case is about a company that basically had an
incentive, strong incentive, to increase the number of assets
to save the company. And it admitted basically they were
unable to account for things properly. So they have a strong
incentive to do something in a certain way. All of the
adjustments that I was discussing extensively in the complaint
and in the brief go one way. They increase assets even if they
have potentially a negative impact on earnings, or what they
refer to, they had a positive impact on earnings, a negative
impact on assets. That's what the restatement did. And that's
the scheme.

         And they have an incentive to do it. Mr. Polovoy

C7GAPLUAps

1    says, yeah, but I bought stock.  That's true.  All that means

2    is they didn't expect to get caught, and they thought that once

3    they got past their problems in '03 and '04, they'd have a

4    high-level company.  And that's actually probably what has

5    turned out --

6              THE COURT:  They bought the stock because they figured

7    they won't get caught.

8              MR. JARVIS:  I think that's quite -- most people who

9    commit fraud, your Honor, in my view, don't expect to get

10   caught.

11             THE COURT:  So wait a minute.  I thought your main

12   theme here was recklessness.  Now you're telling me it's

13   intentional.

14             MR. JARVIS:  I think it's both.  It's sort of

15   conscious disregard that they had some --

16             THE COURT:  Oh, it is both.  You're alleging

17   intentional fraud, not just recklessness.

18             MR. JARVIS:  That the alternative, both.  I think

19   there was intent to do this thing and I think that they were

20   reckless in putting together financial statements.

21             THE COURT:  Let me just shift for a second.

22             MR. JARVIS:  Sure.

23             THE COURT:  How have you established scienter

24   regarding PricewaterhouseCoopers?

25             MR. JARVIS:  Two things.  One, I mean, I just read you

C7GAPLUAps

the restatement, the incredible lack of control.  Pricewater-

houseCoopers was their auditor during that entire period.

THE COURT:  I'm aware of that.

MR. JARVIS:  So those controls existed on

PricewaterhouseCoopers' watch.

Two, there are also GAAP violations.

THE COURT:  Those are the Canadian GAAP violations.

MR. JARVIS:  Yes.  The GAAP violations, I believe, are

set forth in paragraphs 199 through 202 of the complaint, and

the GAAS, Generally Accepted Auditing Standards, in 503 and

504.

Also, you know, we put forth in the complaint the fees

that Price Waterhouse earned.  Obviously they are entitled to

fees for their work.  There's no question there.  However, when

you look, and we did this analysis, where there was --

THE COURT:  Go a little slower.  We have the fastest

court reporter in the whole Second Circuit, but...

MR. JARVIS:  All these points we make -- thank you.  I

will slow down.  Thank you, your Honor.  We have the argument

that's set forth in the complaint, you put the analysis in, you

look at what the audit fees are for certain Fortune 500

companies, companies the size of Fairfax, and the audit fees

paid to Price Waterhouse Canada were double for the period.

They were incentivized by getting high fees.  And the evidence

of the fact that they were not doing their job, that they were

C7GAPLUAps

1   so incentivized, is the restatement itself.

2          THE COURT:  Let me ask you two other questions,

3   please.  First, how did the press releases about the SEC

4   investigation, how did they signal to the shareholders that

5   plaintiff was engaging in "deceptive business practices," such

6   as -- and I'm quoting -- "improperly accounting for

7   intercompany transactions"?  How do the press releases signal

8   anything like that to the shareholders?

9          MR. JARVIS:  I will at the outset acknowledge that the

10  press releases primarily deal with SEC and DOJ investigations

11  relating to accounting for finite reinsurance.  I'm not going

12  to suggest otherwise.  However, the way you get there, your

13  Honor, is you have to look at the context in which these press

14  releases are being made, what information is available to the

15  market.  From the time that they essentially became public

16  companies, there was a lot of reporting and other contexts in

17  which the market was concerned, because a lot of people were

18  reporting on it, your Honor, that there were financial

19  irregularities that Fairfax wasn't accounting for things

20  properly.  And that was always an overhang on the stock.

21  Ultimately there was filed a suit against short sellers for

22  claiming to have established that particular overhang.

23          So what happens when people are out there, investors

24  who are concerned?  This is a company that's not transparent.

25  It is very, very complicated.  And there are lots of

C7GAPLUAps

allegations that the accounting for all kinds of things in this

company was wrong.  They also have the SEC investigations,

albeit only as to a piece of the business, but they're

continual.  First this was denied.  They said that the SEC and

the DOJ wasn't interested.  And then, OK, we have to admit that

the DOJ is sort of interested in what we're doing.  And then

they said, it's only about an industry-wide thing.  But as it

slowly works its way through, you realize that by the end, in

particular the March 22, 2006 press release, the fact that the

DOJ and SEC were focused very squarely on Fairfax because they

were looking at statements that Mr. Larson had made in a

February press conference where he said, oh, our problems are

only limited to OdysseyRe's, a subsidiary, accounting, it turns

out, no, they were looking -- the government thought that was a

false statement.

          And what does this all say?  It says, we, the

investors, know there are problems with the accounting with

this company.  We know the government is looking at these

problems.  And ultimately -- and they valued that and said, OK,

they reduced the share price accordingly.  I think on March 22

alone they lost 13 percent of their value because people were

concerned that there was something wrong with the company.

Ultimately, after the class period, the restatement comes out,

which was prompted, I think there's no doubt, prompted by the

existence of all these SEC and DOJ investigations.  They do a

C7GAPLUAps

1   restatement.  The restatement flows from the investigations

2   that are disclosed.  I think what turns out is that probably

3   the restatement was not as bad as was thought by investors it

4   could be.  So the price goes up.  That doesn't mean that the

5   concerns weren't there.  That just means that the market viewed

6   them as more substantial than they ultimately turned out to be.

7   I think a reasonable example is what happened last week.  JP

8   Morgan Chase released a restatement announcing that they had a

9   $5.8 billion loss with respect to certain derivative trading

10  activity.  The price went up.

11          THE COURT:  They first said it is 2.2.  But they still

12  had pretty good profits, if you're going to argue about Chase

13  Morgan.

14          MR. JARVIS:  Yes, but the point is, though, no one

15  said $5.8 billion is immaterial.  The fact that the price went

16  up just meant that the market had -- they were more concerned,

17  they were afraid it was going to be worse.  And I'm afraid that

18  that's what happened with respect to the restatement in this

19  case.  They were afraid that it would be worse.  So the serial

20  chain of loss causation is all the announcements that there are

21  government investigations into a company that is perceived to

22  be nontransparent, difficult, and which ultimately causes

23  restatements; we can see exactly how much it was.

24          THE COURT:  I said I had two questions.

25          MR. JARVIS:  Yes.  Your second question, your Honor.

C7GAPLUAps

1          THE COURT:  Well, Ms. Nguyen said that you were going

2     to handle what I thought was the Tenth Circuit case, which went

3     into the history of the 1933 and 1934 Acts.  That's the case

4     *Anixter v. Home Stake Productions*.

5          MS. NGUYEN:  I'm sorry, your Honor.  I said that the

6     *Judith v. Wiles* opinion actually discussed *Anixter*.  I didn't

7     mention Mr. Jarvis.

8          THE COURT:  Oh, I misunderstood you.  Well then, I'll

9     ask you, how do you, in spite of the fact that I misunderstood

10    Ms. Nguyen, how do you get around this statement by the Tenth

11    Circuit, "The legislative history reinforces the conclusion

12    that the period" -- the period of repose, that is -- "is an

13    outside absolute period"?  It's not like the statute of

14    limitations.

15         MS. NGUYEN:  Yes, your Honor.  If you accept the

16    reasoning in *American Pipe*, that it's a class action and Rule

17    23 policy considerations apply, such that unnamed class members

18    satisfy the repose period --

19         THE COURT:  What about what Judge Kaplan said that I

20    read?

21         MS. NGUYEN:  Judge Kaplan?

22         THE COURT:  Yes.  Remember I read a quote from Judge

23    Kaplan.

24         All right.  There's no point going over it.  I can

25    read what is in the record.

C7GAPLUAps

```
1            OK.  Why don't you conclude, then.

2            MR. JARVIS:  Let me just -- I will stand on our

3   briefs.  A couple other quick points.

4            THE COURT:  Yes, briefly.

5            MR. JARVIS:  Loss causation.  One of the points that

6   the defendants make is that, oh, by the way you sold out, your

7   client sold out, before the last disclosure on March 22, and is

8   out of the case.  And they cite basically *Flag* and the Second

9   Circuit cases *Dura*, both of which say there has to be a

10  corrected disclosure.  And we didn't really address that in our

11  primary brief so I just wanted to give your Honor a couple

12  cases that your Honor could think about.  In the class

13  certification context, that issue comes up a lot.  In other

14  words, the claim is, you can't certify a class that goes to the

15  end because a particular lead plaintiff sold out before the

16  end, or you can't get purchases from the beginning because a

17  particular lead plaintiff purchased later.

18            There are two cases there that I think are interesting

19  on that.  There are some that are older, *Feldman v. Motorola*,

20  1993 WL 497228, and *Schleicher v. Wendt*, 2009 WL 761157, from

21  the Southern District of Indiana.  And what they both basically

22  say is, you don't have to have a plaintiff who has purchases

23  essentially on every day of the class period.  The class who

24  bought on every day of the class period, the lead plaintiff, is

25  a representative plaintiff as long as they have a standing that
```

C7GAPLUAps

1    they haven't sold after some disclosures, they have some

2    things.  We're not going to say that they have to apply on the

3    first day and sell on the last day and that the class is

4    coextensive with the purchase history.  The lead plaintiff

5    cases just don't do that.  And cases on loss causation simply

6    are not particularly relevant.  This is really -- there's no

7    argument -- there's an argument, but certainly the argument, if

8    you buy our loss causation argument, there are correct

9    disclosures here.  The question is whether this plaintiff

10   should be allowed to stand in for everybody who did buy.  So I

11   wanted to address that, because we did not address that in our

12   brief.

13           And on Section 11 standing, I just wanted to refer the

14   Court to the Judge Bear decision in *Sirius XM*, which is a case

15   where Judge Baer basically said that as long as plaintiffs have

16   standing to sue defendant on certain grounds, at some time they

17   should.  They don't have to have every single claim.  In this

18   particular case, which is I think different from the

19   residential mortgage-backed securities cases that are cited by

20   defendants, there's no question we're all relying on the same

21   false statements in various respects, albeit in the 10b context

22   they brought up earlier.  The only question is whether they

23   bought an offering, and we would argue that under *Sirius XM,*

24   that they simply don't have to have bought in an offering to

25   have standing to pursue them.

C7GAPLUAps

1              THE COURT:  I think I have your point.

2              MR. JARVIS:  Thank you, your Honor.

3              THE COURT:  Thank you very much.  Decision is

4    reserved.

5                            o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25